330 S.E.2d 677

**STATE ex rel. TAYLOR ASSOCIATES, and James S. Paxton**

v.

**Hon. Jack R. NUZUM, Judge, and Herbert G. Underwood.**

**No. 16649.**

Supreme Court of Appeals of West Virginia.

Submitted April 30, 1985.

Decided May 29, 1985.

Everette F. Thaxton & Thomas L. Stanley, Thaxton & Daniels, East, Charleston, for relators.

Herbert G. Underwood, Steptoe & Johnson, Clarksburg, for respondent.

NEELY, Chief Justice:

In this action the petitioners, Taylor Associates and James S. Paxton, seek a writ of prohibition against the Circuit Court of Randolph County to disqualify Herbert G. Underwood, a lawyer with the prominent Clarksburg firm of Steptoe & Johnson, from participating in a pending case. The

petitioners allege that Mr. Underwood represents a party with adverse interests to those of an existing (or former) client and, secondly, that he has communicated with the latter party about the pending civil action outside of the presence of her lawyer while representing her adversaries. Because of the appearance of impropriety, this Court grants the writ prayed for.

On 9 May 1984 the petitioners filed an action in the Circuit Court of Randolph County to recover a broker's commission allegedly due to Taylor Associates and James S. Paxton.[1] On Sunday, 13 May 1984, Herbert G. Underwood, while at the offices of one of the defendants, telephoned Mrs. Beth A. Taylor of Taylor Associates to inform her that he intended to represent all of the named defendants in the civil action except the Mower Lumber Company, and that a counterclaim would be filed against Taylor Associates and James S. Paxton.[2] Mrs. Taylor related this conversation to her present counsel and informed him of an apparent ongoing lawyer-client relationship between herself and Mr. Underwood.

In July of 1984 the petitioners' counsel contacted Mr. Underwood by telephone to ask him to withdraw from the pending civil action. Counsel felt that the apparent synchronous representation of Mrs. Taylor and her adversaries was improper. Agreeing to review the matter, Mr. Underwood subsequently notified the petitioner that his relationship with Mrs. Taylor did not mandate withdrawal.

Mr. Underwood represented Mrs. Taylor in two civil actions in the Circuit Court of Harrison County during February and March of 1982. Mrs. Taylor recovered a judgment in the second of those lawsuits that is, as yet, not satisfied. Within the past year Mrs. Taylor has had several con-

1. Civil action No. 84–C–209, *Taylor Associates, a corp., ex rel. James S. Paxton v. The Mower Lumber Co.; Mace Knob Land Co.; Charles E. Bryant; John F. Brown, Jr., John E. Busch and Steven G. Jory, as individuals and as trustees of Mace Knob Land Co.* Taylor Associates is a real estate company owned by Mrs. Beth A. Taylor. Mrs. Taylor's company, however, is not a corporation.

2. During the hearing on the motion to disqualify Mr. Underwood, Mr. Underwood was asked if he made it a habit of talking to clients of other lawyers outside of the presence of their lawyer of record. He replied, "No, I don't, but I do make it a habit to speak conversationally with friends and acquaintances whether I am litigating against them or not and that's the position I found myself in."

versations with Mr. Underwood and has delivered to his office documents to assist him in collecting the Harrison County judgment. Mrs. Taylor maintains that Mr. Underwood is "my attorney" despite the absence of a retainer agreement and that both Mr. Underwood and she have proceeded for years under that assumption.

The present controversy, however, begins at the end of 1983 when Mrs. Taylor was contacted by Mr. James S. Paxton who was contemplating an action to collect a brokerage fee that he felt was owed him by the Mower Lumber Company and others. Mrs. Taylor is the sponsoring broker for Mr. Paxton, who has been affiliated under a brokerage license with her company, Taylor Associates, since about 1980. Because Mr. Paxton is an unlicensed broker, all commissions that he earns are paid first to Taylor Associates and then released by that company to him. For this reason, Mr. Paxton cannot maintain a lawsuit to enforce a commission without joining Taylor Associates in the lawsuit. Mrs. Taylor agreed to join him in bringing the action against Mower.

After her discussion with Mr. Paxton, Mrs. Taylor telephoned Mr. Underwood at his office to discuss a potential lawsuit, and, reportedly, received Mr. Underwood's agreement to represent Mr. Paxton and Taylor Associates. According to Mrs. Taylor, Mr. Underwood asked her to have Mr. Paxton contact him at his office. Mr. Underwood, for his part, has no recollection of this telephone conversation nor did Mr. Paxton ever manage to speak with Mr. Underwood about the case. (Mr. Paxton subsequently hired his present counsel to pursue the claim.)

Mr. Underwood became counsel for some of the defendants in Mr. Paxton's civil suit on 9 May 1984. At no time has either he or Mrs. Taylor interrupted their relationship, which Mr. Underwood defines as friendly and which Mrs. Taylor considers both friendly and professional. Mr. Underwood admits that during several informal meetings with one another, they referred to the pending lawsuit and that he assured her that she, personally, would not be "hurt."

He also told her that the counterclaim he was filing was insignificant. In addition, on Sunday, 17 February 1985, six days after counsel for petitioners filed a motion to remove Mr. Underwood as counsel for the defendants, Mr. Underwood visited Mrs. Taylor at her home. During this visit he noted that he did not "care for the content of the dismissal motion" and intimated that Mrs. Taylor should not be involved in the lawsuit. A week later, on 25 February 1985, the petitioners' motion for removal of Herbert G. Underwood was heard before the circuit court.

I.

Admittedly this Court is faced here with a tempest in a teapot. Obviously Mr. Underwood and Mrs. Taylor were not of the same mind regarding their relationship. Nonetheless, Mrs. Taylor was of the opinion that Mr. Underwood was *her* lawyer and, proceeding under that assumption, communicated freely with him and received visits and communications frequently from him.

If there is one area of law in which the Latin maxim, *de minimus non curat lex* is generally unavailing, it is in the realm of the lawyer—client relationship. Indeed, the *Code of Professional Responsibility* addresses a lawyer's obligations with a past, present or potential client in rather inflexible language and it is positively rigid in prohibiting contacts with an opponent's client without the knowledge and approval of the adversary's lawyer. In these types of situations the *Code* notes that actual impropriety need not be indicated; the mere appearance of impropriety suffices. DR9–101. Often this standard seems rather Rhadamanthine, but lawyers, as officers of the court and technicians with unique skills, are held bound to it.

Under DR7–104 of the *Code*, a lawyer is strictly enjoined to forego any communication with a client on the other side of a legal dispute whom he knows is represented by a lawyer "unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so." DR7–104(A)(1). In this case, Mr. Un-

derwood admits to several, albeit informal, communications with Mrs. Taylor, without the knowledge or consent of her counsel, on pending litigation in which he represented Mrs. Taylor's opponent. It matters not that his communications with Mrs. Taylor were primarily social in nature. Even in private conversations among friends, Mr. Underwood should have refrained from touching, however slightly, on the pending lawsuit.

█ A more difficult question is presented by the confusion surrounding Mr. Underwood's professional relationship to Mrs. Taylor and his representation of her opponents in the Paxton-Taylor Associates lawsuit. Mr. Underwood dismisses the conflict of interest charge because he has never believed that Mrs. Taylor was either a real party in interest, or seriously committed to Mr. Paxton's lawsuit. Nonetheless, Mrs. Taylor initially contacted him, as her lawyer, to represent Mr. Paxton and herself against the Mower Lumber Company. She alleges she revealed to him all the information she possessed in connection with the lawsuit. For this reason, under DR5–105, Mr. Underwood could not later agree to represent Mrs. Taylor's opponents without compromising either the representation of his new clients or sacrificing his duty of confidentiality to Mrs. Taylor. DR4–101(B).

█ Once a potential or actual client discusses proposed litigation with a lawyer, a court doesn't need to inquire into the receipt of confidential information; communication of confidential information is presumed and is covered by the lawyer-client privilege. *See e.g. State v. Jones*, 180 Conn. 443, 429 A.2d 936, 940 (1980). A lawyer who is the recipient of a potential client's confidence is thereafter disqualified from acting for any other person interested adversely in the same general matter, however slight such adverse interest may be. *Sinclair v. State*, 278 Md. 243, 363 A.2d 468, at 474–75 (1978). Even when there are doubts about the existence of an asserted conflict of interest, these doubts should be resolved in favor of disqualifying the lawyer. *Westinghouse Electric Corp. v.*

*Gulf Oil Corp.*, 588 F.2d 221 (7th Cir.1978). *See also American Dredging Co. v. City of Philadelphia*, 480 Pa. 177, 389 A.2d 568, 572 (1978).

█ It is a nigh universal rule that:

The disqualification of an attorney by reason of conflict of interest will not be denied solely because there is no actual attorney-client relationship between the parties. A "fiduciary obligation or an implied professional relation" may exist in the absence of a formal attorney-client relationship .... It is clear that when an attorney receives confidential information from a person who, under the circumstances, has a right to believe that the attorney, as an attorney, will respect such confidences, the law will enforce the obligation of confidence irrespective of the absence of a formal attorney-client relationship. *Nichols v. Village Voice, Inc.*, 99 Misc.2d 822, 417 N.Y.S.2d 415, 418 (1979).

█ Under the *Code of Professional Responsibility*, a lawyer may be disqualified from participating in a pending case if his continued representation would give rise to an apparent conflict of interest or appearance of impropriety based upon that lawyer's confidential relationship with an opposing party. But having said all this, we do realize that in contemporary litigation, a motion to disqualify is often simply a weapon to delay or destroy an incipient lawsuit. Thus we state that courts must be ever vigilant against the abuse of motions for disqualification where no reasonable grounds exist for such disqualification. *Cf. Ceramco, Inc. v. Lee Pharmaceuticals*, 510 F.2d 268 (2nd Cir.1975).

█ This Court notes that under the rubric of *Hinkle v. Black*, 164 W.Va. 112, 262 S.E.2d 744 (1979) prohibition is a proper remedy in this case. In *Hinkle* this Court stated:

In determining whether to grant a rule to show cause in prohibition when a court is not acting in excess of its jurisdiction, this Court will look to the adequacy of other available remedies such as appeal and the overall economy of

effort and money among litigants, lawyers and courts; however, this Court will use prohibition in this discretionary way to correct only substantial, clear-cut, legal errors plainly in contravention of a clear statutory, constitutional, or common law mandate which may be resolved independently of any disputed facts and only in cases where there is a high probability that the trial will be completely reversed if the error is not corrected in advance.

Syl.Pt. 1 *Hinkle v. Black,* 164 W.Va. 112, 262 S.E.2d 744.

Accordingly for the reasons set forth above the Writ of Prohibition is granted.

Writ Granted.